[Crim. No. 18130. In Bank. June 5, 1975.]

In re ALINE D., a Person Coming Under the Juvenile Court Law.
KENNETH E. KIRKPATRICK, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
ALINE D., Defendant and Appellant.

**COUNSEL**

Richard S. Buckley, Public Defender, John J. Gibbons, George H. Meyerhoff and Laurance S. Smith, Deputy Public Defenders, for Defendant and Appellant.

Laurence R. Sperber, Paul N. Halvonik and J. Anthony Kline as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—We consider the question whether a minor who has previously been adjudicated a ward of the juvenile court and then placed, with unsuccessful results, in various local treatment facilities, may thereafter be committed to the California Youth Authority ("CYA") despite the expressed doubt of the court, acting through its referee, that she would benefit from such a commitment. The record before us reflects that the referee ordered the CYA commitment solely because there appeared to be no other available placement facility. We have concluded that, under the existing statutory scheme, and particularly Welfare and Institutions Code section 734, the commitment was improper and, accordingly, that the cause should be remanded to the juvenile court for reconsideration.

We recite pertinent portions of the troubled history of the minor, Aline D. At the time of her commitment to CYA, she was 16, her father was absent from the family home and her mother had rejected her. She had an I.Q. of 67 and a behavioral history of assaultive conduct and association with juvenile gangs. She was originally placed in a family treatment program at juvenile hall, for reasons not specified in the record. This placement continued from February 23, 1972, to May 1, 1972, and, according to a probation report, was "singularly unsuccessful." Thereafter, she was released to the care of her mother but, one week later, ran away from home. An attempt was made to place her in a probation department community day-care program, but her limited intellectual potential disqualified her. On September 25, 1972, Aline was placed at the McKinnon Girls Home in Los Angeles, but soon thereafter the Home reported that she was having "problems with stealing, shoplifting, . . . refusal to attend school," and was participating in a juvenile gang. Her placement with the Home terminated a few weeks

later when she was arrested following an incident at a high school campus. Aline was returned to juvenile court on allegations that she had violated Education Code section 13560 (wilful insult and abuse of teacher) and Penal Code section 653g (unlawful loitering about a school). Following a hearing, the first charge was sustained and, on November 10, 1972, Aline's wardship was continued and "suitable placement" ordered for her.

Thereafter, on November 20, 1972, Aline was placed at the Penny Lane residential school in Los Angeles where she remained for 10 days after which time her placement was terminated for various reasons, including her use of marijuana, bullying of associates, and membership in a juvenile gang.

On December 14, 1972, Aline was placed at the Detroit Arms Home, where she remained until January 10, 1973. Her placement there was terminated as a result of her "active association" with the gang. A probation report, describing the circumstances of her association with the gang, reported that Aline let in eight or nine boy members of the gang who thereafter took three or four girls and left for two days, causing considerable difficulties.

Aline was returned to juvenile hall, pending further efforts to place her. A report of the foregoing placement efforts summarizes as follows: "Since this current detention on January 10, 1973 all efforts to place minor have met with defeat. Placements are not willing to handle the kinds of behavior minor has displayed in former placements." The responsible placement coordinator indicated that Los Angeles County has had no facilities capable of coping with the minor other than the Las Palmas Girls School.

On February 13, 1973, Las Palmas rejected Aline as unsuitable, because of her record of "assaultive behavior." The Las Palmas officials by letter recommended a commitment to CYA "where she would have the structure she obviously needs and also vocational training." On March 1, 1973, the probation officer filed a supplemental petition in juvenile court, alleging that Aline is not acceptable for placement in Los Angeles County institutions or facilities.

On May 21, 1973, a hearing was held before a juvenile court referee. The referee heard testimony from Mrs. Holt, a probation officer, and considered the contents of her placement report as well as letters and evaluations from psychiatrists regarding Aline's situation. The officer described her investigation of all conceivable placements available to Aline, including her mother and potential foster parents. The investigation included seven different facilities. Each placement was found unsuitable for Aline, although Mrs. Holt learned that Penny Lane eventually planned to establish a "closed setting for girls." According to Mrs. Holt, Aline, as a "severely delinquent young girl," requires a "closed facility" (by which is meant one with locked doors and limited visitation privileges), similar to county camps available for the placement of delinquent boys. If Aline were male, rather than female, Mrs. Holt would have recommended a camp community placement rather than CYA.

The reports of two psychiatrists and a clinical psychologist were before the court but have not been filed with us. The record does, however, contain their recommendations that Aline not be committed to CYA. One psychiatrist stated his opinion that Aline is not truly delinquent and that involvement with more delinquent and criminally oriented youths may adversely influence her. Near the conclusion of the hearing, the referee noted his lack of options. He observed that Aline could not simply be left in juvenile hall, as that facility serves only as a temporary detention facility. He explained his reluctance to order the proceedings dismissed, for Aline's mother had refused to accept her, and Aline would be back "on the streets." He agreed with Aline's counsel that it would be "very unwise to commit this minor to the California Youth Authority for the sole reason that it does not seem that there is anything else." Moreover, the referee acknowledged that "The fact remains, nevertheless, that all agree, including two psychiatrists, a clinical psychologist, Mrs. Holt, *all agree that she's not an appropriate subject for commitment to the youth authority, but that it is being done only because that seems to be the only recourse.*" (Italics added.)

After suspending the hearing temporarily to determine whether Aline might be eligible for placement by the Department of Public Social Services, and after learning that such placement would be refused, the referee concluded that he must order Aline committed to CYA, since ". . . the only other alternative that seems available to me now would be to

dismiss this case and turn this lady out in the street, and I'm not going to do that." Counsel's motion to dismiss the proceedings, and for a rehearing, were denied, and Aline was ordered committed to CYA. Aline appeals.

Although the referee, following the hearing, signed a written form which contained a printed "finding" to the effect that the ward probably would benefit from a CYA commitment, our review of the record, summarized above, leads us to conclude that the referee ordered Aline committed to CYA solely because there appeared to be no other suitable placement for her. The motivation of the referee appears in his conclusion that "it seems that we are powerless" to avoid a CYA commitment. As we will develop below the provisions of the Juvenile Court Law do not permit a CYA commitment under such circumstances.

Preliminarily, we note the provisions of Welfare and Institutions Code section 502, which express in broad terms the general purposes of the Juvenile Court Law. These are to "secure for each minor . . . such care and guidance, preferably in his own home, as will serve the . . . welfare of the minor and the best interests of the State; . . . and when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents." ■ The Juvenile Court Law is to be liberally construed to carry out the foregoing purposes.

In specific amplification of the foregoing purposes and with particular reference to the matter before us, section 734 of the Welfare and Institutions Code provides that "No ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is *fully satisfied* that the mental and physical condition and qualifications of the ward are such as to render it *probable that he will be benefited* by the reformatory educational discipline or other treatment provided by the Youth Authority." (Italics added.)

■ The foregoing language makes it clear that a CYA commitment may not be made for the sole reason that suitable alternatives do not exist. Instead, the court must be "fully satisfied" that a CYA commitment probably will benefit the minor. In the instant case, the referee's in-court statements, far from indicating that he was "fully satisfied," disclosed instead a substantial *dissatisfaction* with a CYA commitment.

The requirements of section 734 not having been met, the commitment order must be reversed.

The rationale underlying section 734 becomes clear upon consideration of certain other sections of the Juvenile Court Law pertaining to the disposition of juvenile court wards. A review of these sections discloses a carefully conceived pattern affording the juvenile court a wide variety of choices at the dispositional phase of juvenile proceedings. Thus, a minor adjudged a "dependent child" under section 600 as one needing parental care and control or being destitute, or mentally or physically deficient, or whose home is unfit, may, under section 727, be placed in the care of (a) some reputable person of good moral character, (b) some association organized to care for such minors, (c) the probation officer for purposes of placement, or (d) any other public agency organized to provide care for needy or neglected children.

If the child is adjudged a ward of the court under section 601 because he refuses parental authority, or is beyond parental control, or is a truant or in danger of leading an immoral life, ". . . the court may order any of the types of treatment referred to in Section 727, and as an additional alternative, may commit the minor to a juvenile home, ranch, camp or forestry camp. If there is no county juvenile home, ranch, camp or forestry camp within the county, the court may commit the minor to the county juvenile hall. . . . Such ward may be committed to the Youth Authority only upon a proceeding for the modification of an order of the court conducted pursuant to the provisions of Section 777 [requiring the filing of a supplemental petition in order to change placement to CYA]." (*Id.,* § 730.)

Finally, when a minor is adjudged a ward of the court under section 602, i.e., the minor has committed a criminal offense or having been adjudged a ward under section 601 fails to obey an order of the juvenile court, ". . . the court may order any of the types of treatment referred to in Sections 727 and 730, and as an additional alternative, may commit the minor to the Youth Authority."

We may assume that Aline's wardship presently derives from a finding, under section 602, that she had either committed a criminal offense or had failed to obey an order of the juvenile court, by reason of a *nunc pro tunc* order to that effect entered on June 27, 1973. In any event, Aline's counsel does not suggest otherwise.

Under section 732, "Before a minor is conveyed to any state or county institution pursuant to this article, it shall be ascertained from the superintendent thereof that the person can be received." Likewise section 1736 provides in part that CYA "may in its discretion accept such [juvenile court] commitments." While sections 732 and 1736 suggest that CYA is vested with a measure of discretion to accept or reject juvenile court commitments, section 736, subdivision (a), indicates that such discretion is a limited one. Section 736, subdivision (a), provides that "The Youth Authority *shall* accept a person committed to it pursuant to this article if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care. . . ." (Italics added; see also *Bryan* v. *Superior Court,* 7 Cal.3d 575, 584-586 [102 Cal.Rptr. 831, 498 P.2d 1079], regarding the CYA's rejection criteria.)

As properly observed by Justice Kingsley in the opinion by the Court of Appeal in this case, "The statutory scheme . . . as now embodied in sections 730 et seq. of the Welfare and Institutions Code, contemplates a progressively restrictive and punitive series of disposition orders in cases such as that now before us—namely, home placement under supervision, foster home placement, placement in a local treatment facility and, as a last resort, Youth Authority placement."

As is evident from the applicable statutes, "Commitments to the California Youth Authority are made only in the most serious cases and only after all else has failed." (Thompson, Cal. Juvenile Court Deskbook, § 9.15, p. 123.) This concept is well established and has been expressed by the CYA itself. In light of the general purposes of juvenile commitments expressed in Welfare and Institutions Code section 502, discussed above, ". . . commitment to the Youth Authority is generally viewed as *the final treatment resource* available to the juvenile court and which least meets the description in the above provision [§ 502]. Within the Youth Authority system, there is gathered from throughout the State the most severely delinquent youths which have exhausted local programs." (Italics added; California Youth Authority, Criteria and Procedure for Referral of Juvenile Court Cases to the Youth Authority (1971) p. 1.)

We find of some significance the expressed guidelines and criteria prepared by the CYA itself in the above referenced publication which juvenile courts may use in CYA referrals. The "Criteria" lists (at p. 2) several "inappropriate cases" for commitment, including (1) *youths who*

*are dependent or primarily placement problems*—"For these youths in need of a home and peer acceptance, as well as accepting adults, life in an institution might be totally fulfilling, resulting in an orientation to an institutional existence"; (2) *unsophisticated, mildly delinquent youths,* "for whom commingling with serious delinquents who make up the bulk of the Youth Authority population might result in a negative learning experience and serious loss of self-esteem"; and (3) *mentally retarded or mentally disturbed youths,* "for whom the probable benefits of treatment within the mental health system exceed those of programs within the Youth Authority. The Youth Authority has no programs for the mentally retarded nor psychiatric treatment programs for the mentally ill." The foregoing classifications in combination approach a behavioral profile of Aline, for in addition to her dependency and placement problems and delinquency, the record suggests that she is "borderline" mentally retarded.

Furthermore, statistics compiled by CYA indicate that at Ventura School for Girls (the only suitable CYA institution for Aline), Aline would be placed in the company of girls who had committed serious criminal offenses, including 16 homicides, 31 robberies and 38 assaults. (Department of the Youth Authority, Characteristics of California Youth Authority Wards (1974) Table 1E, p. 7.) According to the CYA's 1973 annual report, 85 percent of all youths committed to CYA had three or more delinquency "contacts," and 35 percent had eight or more such contacts. (Department of the Youth Authority, 1973 Annual Report, p. 11.)

In sum, the record before the juvenile court discloses that CYA may not be a suitable placement facility for Aline, and that the referee himself, acting for the juvenile court, entertained very substantial doubt in the matter. The record does not disclose that the court was, in the language of the statute, "fully satisfied that the . . . condition and qualifications of the ward are such as to render it probable that he will be benefitted" by the discipline or treatment available at CYA.

In order to assist the juvenile court in its reconsideration of the cause, we note a few possible alternative dispositions. Our suggestions should not be considered exhaustive of the possibilities, and the court should explore, of course, any other placement opportunities which the parties or the probation officer may suggest.

First, although the record indicates that Aline was ineligible for placement at various institutions within Los Angeles County, it is not clear whether the placement officer or the court considered the possibility of placing Aline at a juvenile home, ranch or camp in another county. Section 888 of the Welfare and Institutions Code provides in pertinent part that, "Any county establishing such juvenile home, ranch, or camp under the provisions of this article [to place §§ 601 or 602 wards] may, by mutual agreement, accept children committed to such home, ranch, or camp by the juvenile court of another county in the State and the State shall reimburse the county maintaining the home, ranch, or camp to the amount of one-half the administrative cost of maintaining each child so committed. . . ."

Second, reference was made at the May 1973 hearing to the anticipated establishment of closed facilities at the Penny Lane school where Aline had once been placed. Mrs. Holt seemed to believe that such closed facilities might be a suitable placement for Aline.

Third, testimony at Aline's hearing described facilities in Los Angeles County for *boys* of the type appropriate for minors such as Aline. Although appearing to be the least promising alternative, conceivably some arrangement could be made to provide care and treatment for Aline at these facilities under some segregated arrangement.

Fourth, the record indicates that Aline may be a "borderline" mentally retarded child. Under Welfare and Institutions Code section 6550 et seq. provision is made for the commitment to state hospital of juvenile court wards found (following evaluation and report) to be mentally retarded or mentally disordered. (See also § 6512.)

Finally, if on reconsideration the court determines that no appropriate alternative placement exists, but also finds that Aline probably would benefit from a CYA commitment under present circumstances, the court could consider the possibility of a temporary 90-day CYA commitment for purposes of observation and diagnosis, with provision for a report by the director of CYA concerning Aline's amenability to treatment. (See Welf. & Inst. Code, § 704.) If the report indicates that Aline would not benefit from the treatment she would receive at CYA, and if no appropriate alternative placement exists at that time, then the proceedings should be dismissed. (Welf. & Inst. Code, § 782.)

■ Juvenile commitment proceedings are designed for the purposes of rehabilitation and treatment, not punishment. (See *In re J. L. P.,* 25 Cal.App.3d 86, 89 [100 Cal.Rptr. 601]; Welf. & Inst. Code, § 502.) We fully recognize that in some cases, as in that before us, the question of appropriate placement poses to the appropriate officials seemingly insurmountable difficulties. Budgetary limitations, varying from county to county, may well preclude the maintenance of those specialized facilities otherwise necessary to provide the minor with optimum care and treatment. Even if such facilities exist, the minor's past conduct may itself require his or her exclusion therefrom. Nevertheless, under the present statutory scheme, supported by sound policy considerations, a commitment to CYA must be supported by a determination, based upon substantial evidence in the record, of probable benefit to the minor. ■ The unavailability of suitable alternatives, standing alone, does not justify the commitment of a nondelinquent or marginally delinquent child to an institution primarily designed for the incarceration and discipline of serious offenders.

The order of commitment is reversed and the cause remanded for further proceedings consistent with this opinion.

Wright, C. J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**CLARK, J.**—I dissent.

Welfare and Institutions Code section 734 precludes neither a judge's expression of sorrow when required to commit a juvenile ward to the California Youth Authority, nor his expression of regret when less restrictive alternatives are unobtainable. Instead, section 734 only requires that the juvenile court find CYA commitment to be the most beneficial disposition available. The record reveals this statutory requirement has been more than satisfied.

Aline's history of delinquency includes shoplifting, theft, smoking marijuana and assaulting a grandmother. Her behavior has frequently been characterized as "assaultive," leading her probation officer to describe her as "a severely delinquent young girl . . . in terms of being a public menace."

Exhaustive efforts—all unsuccessful—were made to place Aline within the community. The first placement, in a family treatment program, was

regarded as "singularly unsuccessful"[1] and terminated after two months. Admission in a community day care program was then denied the ward due to her low intelligence. McKinnon Girls Home released Aline in two weeks because of "problems with stealing, shoplifting, bedwetting, refusal to attend school" and the claim she was a leader of a local street gang, the Cripts.

Aline's fourth placement, at Penny Lane School, lasted only 10 days because she "[s]moked grass at a concert—is muscle of the resistive kids—threatens weaker girls—girls are terrified as she leans on being a member of the Cript gang. About five Cript boys came to Penny Lane to see her—'freaked out' staff as one got into the house." Her fifth disposition, at the Detroit Arms, was terminated when Aline "let in eight or nine Cripts in the placement who took three or four girls and split for two days."

At this point the Los Angeles County placement coordinator concluded the county had no facility capable of coping with Aline, "other than possibly Las Palmas Girls School." However, Las Palmas declined to enroll the ward, concluding her assaultive behavior, low intelligence level and nonacceptance of responsibility revealed Aline "could not benefit from either our school or group therapy[,] the two main aspects of our program." Las Palmas recommended she be committed to the CYA "where she could have the structure she obviously needs and also vocational training."

Before Aline's commitment to the Youth Authority *seven* additional placement alternatives were investigated, all proving unsatisfactory. The commitment hearing itself was recessed to give the probation officer time to explore placement with the Department of Public Social Services. However, like previous efforts, this proved fruitless.

The record clearly reveals that all parties at the hearing—including Aline's counsel—agreed that every conceivable placement alternative had been exhausted, the only remaining disposition being to either completely dismiss Aline's wardship or to commit her to the CYA.[2] Since Aline's mother has refused to accept her back into the home, dismissal would place this child in the streets and under the influence of

---

[1] Unless otherwise noted, the remarks in quotations are derived from the record.

[2] From the juvenile court hearing to the present time, neither appellant nor the majority has specified any county facility suitable for Aline. Their contention that such a placement alternative *perhaps* exists is of no help to the lower court.

her gang. In these circumstances, release would provide Aline nothing but the opportunity to qualify more fully for CYA commitment—hardly a course of action to be recommended to the juvenile court system.

In contrast, CYA commitment offers Aline foreseeable benefit through treatment and training. The authority is empowered "to make use of law enforcement, detention, probation, parole, medical, educational, correctional, segregative and other facilities, institutions and agencies, whether public or private, within the State." (Welf. & Inst. Code, § 1753.) Its director is authorized to "enter into agreements with the appropriate public officials for separate care and special treatment in existing institutions for persons subject to the control of the Authority." (Welf. & Inst. Code, § 1753.) Finally, it can even train its own specialists. (Welf. & Inst. Code, § 1752.6.) Far from being a single "placement facility,"[3] the CYA is an *administration* comprised of *many* facilities, capable of providing individualized treatment where necessary.

The propriety of a CYA commitment under these circumstances cannot be negated by a juvenile court judge's expression of concern and regret. Such expression is not uncommon and should be commended —not masked by judicial indifference. Aline and her unfortunate circumstances understandably frustrated the judge. But while he no doubt was sorry that the ward's misconduct was sufficiently serious to "force the system to the wall," his statements were intended to make Aline realize that, in ordering commitment, he was doing only what her circumstances and conduct compelled. Such communication increases the minor's understanding for the system, improving his or her chance for rehabilitation and accountability to society.

Moreover, although the juvenile court judge commonly fears commitment may prove counterproductive, such fear is not prohibited by section 734. The code only requires the court's satisfaction that the conditions and qualifications of the ward "render it *probable* that he will

---

[3]*Ante,* p. 565.
Similarly, the majority's description of the authority as "punitive" is misconceived. California juvenile law has specifically rejected the concept of punishment: "The purpose of [the chapter establishing the CYA] is to protect society more effectively by substituting for retributive punishment methods of training and treatment . . . ." (Welf. & Inst. Code, § 1700.) "Care and guidance" are the fundamental principles around which the juvenile justice system is fashioned. (Welf. & Inst. Code, § 502.) Treatment is not punitive even though the ward's mobility is curtailed. (Cf. *In re De La O* (1963) 59 Cal.2d 128 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].)

be benefited" by commitment.[4] (Italics added.) It is unreasonable to interpret this section to require full satisfaction that successful treatment will not be jeopardized by adverse influences.

Finally, the majority's holding will stifle communication between judge and ward, replacing it with the formalism characteristic of the adult criminal trial. This is unfortunate. The closer a juvenile hearing moves toward becoming an adversarial proceeding, the more a child tends to view the law as either his oppressor or his fool—depending on who "wins the contest."

In conclusion, Aline must be characterized as an aggressive, assaultive delinquent who may benefit from CYA training and discipline. Disposition of her case should not rest on a judge's expression of sorrow or dismay. If it does, we fail both Aline and the juvenile justice system.

I would affirm the judgment of the juvenile court.

McComb, J., concurred.

On July 3, 1975, the opinion was modified to read as printed above.

---

[4]The judge here entered a *written finding* specifically stating that commitment to the CYA would be beneficial to Aline. However, the majority chooses to reject this finding and to reverse this case on the basis of explanatory remarks clearly intended by the juvenile judge *to benefit the child.*