758 P.2d 1287 (1988)
In the Matter of J.H., a Minor.
No. A-2521.
Court of Appeals of Alaska.
July 15, 1988.
Terri Spigelmyer, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for J.H.
*1288 Teresa Williams, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for the State of Alaska.
Vincent Vitale, Law Offices of Vincent Vitale, Anchorage, for Parents of J.H.
Barbara L. Malchick, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, as Guardian ad Litem.
Before BRYNER, C.J., COATS, J., and SERDAHELY, Superior Court Judge.[*]
BRYNER, Chief Judge.
J.H., a minor, appeals an order of institutional commitment entered upon her adjudication as a delinquent child by Superior Court Master William D. Hitchcock and approved by Superior Court Judge Victor D. Carlson. J.H. contends that the superior court erred in rejecting less restrictive alternatives to institutionalization. We reverse.
J.H., a sixteen-year-old girl, was adjudicated a delinquent child for acts that would have amounted to burglary in the second degree, AS 11.46.310(a) (a class C felony), and criminal mischief in the third degree, AS 11.46.484(a)(2) (a class A misdemeanor). On March 7, 1988, J.H., accompanied by another person, entered her father's place of business without permission; each of them took a truck. J.H. was apprehended the following day. Based on this incident, the state filed a petition on March 11, 1988, seeking J.H.'s adjudication as a delinquent child. J.H. admitted the allegations of the petition at arraignment.
The record discloses that J.H. was born in Las Vegas, Nevada, to a sixteen- or seventeen-year-old woman. J.H. stayed with her mother for about four months but was undernourished and neglected. J.H. was then adopted by her mother's sister and the sister's husband. She spent the next six years living with them. J.H.'s first adoptive mother severely abused J.H., both physically and sexually. During this time, J.H. was also apparently abused by her maternal grandmother.
When J.H. was six years old, her adoptive father made arrangements for her to live in Anchorage with Mr. and Mrs. H., who eventually adopted her. Until August of 1987, when she was fifteen years of age, J.H. maintained a relatively unremarkable relationship with her second adoptive parents. Although Mr. and Mrs. H. report that there have always been behavioral problems stemming from J.H.'s early years of abuse, those problems were minor before the summer of 1987.
In August of 1987, J.H. ran away from home. She returned after approximately a week, but ran again in October. She returned home again within about a week. On December 16, 1987, J.H. ran away from home for a third time. The following day she encountered her mother at an Anchorage shopping mall and threatened to commit suicide if her mother forced her to return home. As a result of J.H.'s suicide threat, her parents had her committed to the Alaska Psychiatric Institute (API) for observation.
J.H. was released from API on January 16, 1988, having spent approximately one month in the hospital. Her discharge summary found no indication of any mental illness or serious conduct disorder. The report diagnosed J.H.'s problem as an adjustment disorder with disturbance of conduct. The problem was attributed to the abuse that J.H. experienced in her early years and to J.H.'s inability to cope in the context of her current family situation. The API discharge summary noted:
Interviews focused with the patient on relationship between her feelings about her prior abuse and problems she is having dealing with authority figures and family relationships, as well as reinforcing the need for family therapy if she is ever going to be able to be reintegrated into her adoptive family.
The discharge summary concluded that, as long as J.H. remained at home, her prognosis would remain poor and she would continue to present a high risk of running away. The report strongly recommended residential treatment:

*1289 The patient needs a residential treatment program such as Booth Memorial Home, while she and her family continue in family therapy. This patient is not committable. Should the patient continue to live at her adoptive parents' home, she is at high risk for running away.
Despite the report's recommendation, J.H. returned home upon her discharge from API. After a short time at home, she ran away again. J.H. came to the attention of the authorities on this occasion when she tried to stay at a girlfriend's house after her girlfriend's parents instructed her to leave. The girlfriend's parents called the police, who initially placed J.H. in custody for trespassing. Subsequently, on February 2, 1988, the state filed a petition alleging that J.H. was a child in need of aid. The trespassing charges were not pursued.
At a probable cause hearing on the child in need of aid petition, J.H. stated that she would refuse to return home. J.H.'s parents indicated that they were incapable of dealing with J.H., that they were concerned that she would run again if allowed to return home, and that they believed she needed to be placed in a setting where she would be required to obtain treatment.
Apparently, however, there were no immediate openings available in any residential treatment program. The court expressed reluctance to place J.H. in a foster home, observing that such a placement would offer no better assurance of controlling J.H.'s behavior than her home placement. The court ordered J.H.'s case continued for a period of thirty days and directed preparation of a treatment plan. After ordering J.H. to stay home and go to school, and after instructing her concerning the possibility of contempt, the court ordered J.H. to return home pending a further hearing to determine an appropriate treatment plan.
J.H. ran away from home within two weeks. She was taken back into state custody on February 17, 1988, and an amended child in need of aid petition was filed. According to the petition, J.H. complained that she had been beaten by her father. The social worker who filed the amended petition stated that she had observed various bruises and a cut on J.H.
J.H. appeared in court in response to the amended petition on February 19, 1988. All parties stipulated to a ninety-day period of temporary state custody. The court appointed the Public Defender Agency to represent J.H. and also appointed the Office of Public Advocacy as guardian ad litem. After setting a new hearing date, the court ordered J.H. to be placed in a foster home pending development of a treatment plan. The state additionally requested an order requiring J.H. and her parents to undergo family counseling. J.H.'s parents opposed the request. The court directed J.H.'s parents to file a written opposition.
J.H.'s parents subsequently filed, through counsel, a formal opposition to any additional family counseling efforts. At the same time, the parents requested commencement of contempt proceedings against J.H. They alleged that J.H. would not "participate in counseling in a meaningful manner until and unless she has been consequenced for her contemptuous behavior." The contempt proceedings against J.H. were ultimately abandoned, however, because J.H. ran away from her foster home and committed the acts that led to her adjudication as a delinquent child.
Following J.H.'s apprehension and her admission of the delinquency petition, the superior court scheduled a disposition hearing for April 5, 1988, and ordered J.H. detained pending the hearing. A predisposition report was prepared by the Division of Family and Youth Services. The report characterizes J.H. as an emotionally immature sixteen-year-old who is in desperate need of treatment for the problems stemming from her early years of abuse, as well as for her more recent problems in coping with her current family situation.
In addition to J.H.'s repeated episodes of running away from home, her performance at school appears to have deteriorated. She has shown no interest in classes, has had numerous absences, and has become involved in fights with other students. In February of 1988, about a month before the incident that led to her adjudication as *1290 a delinquent child, J.H. stopped attending school after being questioned by school authorities concerning her connection with an incident involving distribution of drugs among students.
During her periods away from home, J.H. has become involved with adult men; there are also indications that she has extensively used controlled substances and alcohol. The precise scope of these activities is difficult to determine, however, because, as part of her acting out behavior, J.H. apparently attempts to cast herself in a bad light by deliberately exaggerating her substance abuse and her relationships with older men.
According to the predisposition report, J.H.'s early experiences of abuse have in all likelihood resulted in several prominent difficulties. She has a distrust of authority figures and has difficulty forming stable, trusting relationships with adults. She also encounters confusion in differentiating between friendship and sexuality in her relationship with older men. There is a particular concern that J.H.'s confusion might make her vulnerable to exploitation.
The author of J.H.'s predisposition report strongly recommended that J.H. be placed for treatment in the residential program at Booth Memorial Home (Booth). The report noted that J.H. had already been screened by Booth and had been approved for acceptance. This recommendation was endorsed by the Division of Family and Youth Services' placement committee. An immediate opening at Booth was available at the time of J.H.'s disposition hearing.
At the April 5 disposition hearing, the superior court master had before him the predisposition report and the API discharge summary. With the exception of J.H.'s parents, all of the parties at the predisposition hearing  including the state, the guardian ad litem, and J.H. herself  agreed that placement in the Booth program would be the most desirable treatment setting for J.H.
J.H.'s parents, however, insisted that J.H. be institutionalized at the McLaughlin Youth Center. In their view, J.H. would simply continue to run away unless placed in a confined setting.
When questioned at the predisposition hearing concerning his recommendation for treatment, the author of J.H.'s predisposition report, Probation Officer Gary Caddell, acknowledged that J.H.'s own willingness to engage in treatment was the only assurance that she would not run from Booth. Caddell also recognized that J.H. would continue to pose a danger to herself and others as long as she had not received treatment, and he conceded that the sincerity of J.H.'s commitment to treatment was questionable.
Caddell nevertheless adhered to his recommendation for placement at Booth. He indicated that institutionalization at McLaughlin could have a harmful impact on J.H. He stated that J.H. appeared to be amenable to treatment and that Booth appeared to be the best place for her to receive it. Caddell emphasized that Booth dealt with runaways on a continual basis.
J.H. spoke briefly in her own behalf at the disposition hearing. She said that she had a strong commitment to succeeding in the Booth program.
Despite the near unanimous recommendations of the parties, the superior court master rejected Booth as a dispositional alternative and ordered J.H. institutionalized. The master found that J.H. was not credible and that her desire for treatment at Booth did not appear to be genuine. The master reasoned that J.H. could be assured of success at Booth only if she was genuinely committed to treatment. On this basis, he concluded that J.H. could not successfully be treated at Booth:
It appears to this court that one of the primary prerequisites to a successful placement at a program such as Booth would be evidence that the minor is committed to change and is receptive to treatment. Judging the minor's commitment by words alone is an exercise that is fraught with peril. I believe the court must look at the whole array of facts in making that determination. Here, there are unfortunately several serious indicators that [J.H.'s] verbal commitment cannot *1291 be weighed too heavily. I believe credibility is clearly a question, and I don't believe that [J.H.] is credible. Her actions, her pattern of behavior, both before and after D.Y.F.S. involvement, make this all very doubtful. For [J.H.] to succeed at Booth, I believe there must also be evidence to indicate that she could develop a bond, a bond of trust with staff that would offer some hope of holding her into the program. Again, unfortunately, I find the evidence bodes to the contrary. Again, as the probation officer recognizes himself, [J.H.] has shown an inability to trust adults, to form meaningful relationships, to accept nurturance from caring adults.
The master's order of institutionalization was subsequently upheld by the superior court. On appeal, J.H. challenges the ruling, alleging that it is unsupported by the evidence.
Alaska Statute 47.10.080(b) sets forth the various alternatives for disposition following an adjudication of delinquency, including restitution, probation, foster home placement, and institutionalization. Because the statute itself gives no guidance for selection of an appropriate alternative, this court, in R.P. v. State, 718 P.2d 168 (Alaska App. 1986), adopted the "least restrictive alternative" approach, which has been endorsed by the IJA-ABA Juvenile Justice Standards Project, Standards Relating to Dispositions § 2.1 (Tent.Draft 1977) (hereinafter IJA-ABA Standards). We said in R.P.:
Under the Standards, the court must consider and reject less restrictive alternatives prior to imposition of more restrictive alternatives. Further, the state has the burden of proving that less restrictive alternatives are inappropriate by a preponderance of the evidence.
R.P., 718 P.2d at 169 (emphasis in original; citation omitted).[1]
The least restrictive alternative approach has now been incorporated in the Alaska Delinquency Rules. Delinquency Rule 23(d) requires the court to "order the least restrictive alternative disposition under AS 47.10.080(b) that addresses the juvenile's treatment needs and protects the public." Under Delinquency Rule 11(e), the state bears the burden of proving by a preponderance of the evidence that a particular disposition "is the least restrictive alternative appropriate to the needs of the juvenile and the protection of the community."
To determine the least restrictive alternative in a given case, the court must consider, among other things, the seriousness of the offense, the degree of the child's culpability, the totality of the underlying circumstances in the case, and the child's prior record. R.P., 718 P.2d at 169-70. The goal of rehabilitation is always of paramount importance in children's proceedings. Id. at 169-70 n. 1; In re Aline D., 14 Cal.3d 557, 121 Cal. Rptr. 816, 822, 536 P.2d 65, 70 (1975). Accordingly, a strong presumption against institutionalization attaches in all but extreme cases. R.P., 718 P.2d at 169-70 n. 1.
On appeal, this court must defer to the trial court's superior fact finding abilities. This court is precluded from reversing the superior court's findings on factual matters in the absence of clear error. Nevertheless, the ultimate determination of whether a particular disposition constitutes the least restrictive alternative is a question of law, and not one of fact. See State ex rel. S.J.C. v. Fox, 165 W. Va. 314, 268 S.E.2d 56, 58 n. 2 (1980); State v. M.M., 163 W. Va. 235, 256 S.E.2d 549, 556 (1979).
In the present case, we find that the superior court erred in concluding that institutionalization was the least restrictive alternative available for J.H. Although we agree with the superior court master's observation that the least restrictive alternative approach does not require that a child be allowed to fail at each level of placement before placement in the next restrictive level may be made, we find no substantial *1292 evidence in the record of the present case to warrant a conclusion that J.H.'s treatment needs could not be successfully addressed by residential treatment such as that offered in Booth.
We accept the superior court's finding that J.H. will pose a serious danger, particularly to herself, as long as she runs from her placement and remains out of control. This problem, however, is typical of adolescent children who are in need of aid by virtue of persistent runaway behavior. Absent some specific indication that J.H.'s criminal misconduct poses such an unusual danger as to preclude placement in a residential treatment facility or that J.H.'s problem with runaway behavior is so intractable as to rule out residential treatment as a placement alternative, the fact that she is a danger to herself and others when she runs does not, in itself, suffice to warrant institutionalization.
We further accept the superior court's conclusion that J.H.'s offense was a relatively serious one and that she was fully culpable in committing it. Yet J.H. had no prior history of serious antisocial behavior, and it seems apparent that her conduct in committing the acts for which she was adjudicated a delinquent child stemmed not from any deeply seated antisocial tendency, but rather from her current and past family problems, for which she stands in need of treatment. The superior court made no contrary finding. Neither the seriousness of J.H.'s offense nor her prior record establishes a need for institutionalization as opposed to residential treatment. J.H.'s acts, if committed by an adult, would amount to a class C felony. Absent exceptional circumstances, a probationary sentence would be warranted for a youthful first offender convicted of a class C felony. See Leuch v. State, 633 P.2d 1006, 1013-14 (Alaska 1981).
The validity of the superior court's determination that J.H.'s treatment needs cannot be addressed at Booth must thus depend on whether there is some other, specific evidence in the record to establish a likelihood that J.H. would not be amenable to treatment except in an institutional setting. Our review of the record discloses an almost total lack of concrete evidence to indicate that J.H.'s placement in a residential treatment setting such as Booth would be futile.
J.H.'s runaway behavior, though persistent and repeated, was of relatively short duration, having commenced only approximately seven months before the conduct that led to her adjudication. It is undisputed that the runaway behavior was precipitated by J.H.'s family situation and that she needs treatment to cope with the problem. It is also undisputed that, despite clear warnings of a need for treatment and despite express predictions that J.H.'s runaway behavior would almost inevitably continue without treatment, no meaningful effort to address J.H.'s treatment needs was ever made prior to her disposition hearing.
While all indications are that J.H. desperately needs treatment and will benefit greatly from it, she has yet to be given an opportunity to participate in treatment.[2] There is utterly no history in the record to suggest that, if given the opportunity to receive treatment in a noninstitutional environment, she would fail. Significantly, during the month that J.H. spent at API  her only placement in a structured setting where some treatment resources were available  she made no apparent attempt to run away.
All of the expert recommendations in the record favor J.H.'s placement in a residential treatment setting such as Booth. Moreover, the record indicates that Booth, which has extensive experience dealing with runaway behavior, has already screened J.H. and found her to be suitable for placement in its program. The attorney for the state, J.H.'s guardian ad litem, *1293 and J.H. herself all concur in the recommendation for placement at Booth.
While the opposing views of J.H.'s parents certainly deserve consideration, their conclusion that J.H. needs to be institutionalized and could not be treated at Booth appears to be based simply on their personal impression that she would continue to run away unless confined and forced to receive treatment. The record of the disposition hearing indicates that J.H.'s parents expressed this view without having taken the opportunity to become personally acquainted with the treatment facilities and program offered at Booth.
In determining, based on this record, that institutionalization was the least restrictive alternative for J.H., the superior court master relied almost exclusively on a personal disbelief in the sincerity of J.H.'s desire for treatment. Master Hitchcock found that a genuine commitment to treatment was necessary to succeed at Booth, and he was not convinced that J.H.'s verbal commitment was "credible."
As we have already pointed out, however, J.H. has never previously run away from a residential treatment setting and has never been afforded any opportunity for treatment at all. The record undisputedly establishes that J.H. has repeatedly run away from home because her home is the primary source of the problems for which she needs treatment. Consequently, her repeated tendency to run away from unstructured family settings cannot be taken as a reliable indicator that she would continue to run from a structured residential placement where therapy is available.
J.H.'s lack of "credibility" is not affirmative evidence establishing that she would not be amenable to treatment. The record contains no evidence to support the master's conclusion that a child must have a genuine commitment to treatment before embarking on a program of rehabilitation in order for that program to succeed. There is no reason to suppose that a child's commitment to treatment cannot be developed through exposure to a viable treatment setting. A contrary conclusion would seem anomalous, for it would require a child to be genuinely committed to a program of rehabilitation without ever being given the opportunity to understand, in any realistic sense, what such a program might involve. Here, Booth determined that J.H. was a suitable candidate for placement in their program. There is no evidence that, in reaching this conclusion, Booth was unfamiliar with J.H.'s background or misled as to the genuineness of the commitment to treatment.
Moreover, by relying on J.H.'s lack of credibility to rule out the possibility of a placement at Booth, the superior court master effectively shifted the applicable burden with regard to proof of the least restrictive alternative. The practical effect of the master's approach was to require institutionalization unless affirmatively persuaded by J.H. that she was genuinely desirous and capable of succeeding in a residential treatment placement. Shifting responsibility to J.H. to convince the court of her serious desire for treatment was unjustified:
In order to support a particular disposition, the Department must prove by a preponderance of the evidence that the disposition is the least restrictive alternative appropriate to the needs of the juvenile and the protection of the community.
Alaska Delinquency Rule 11(e). See also IJI-ABA Standards § 2.5 B, commentary at 40-41.
We conclude that the superior court's finding that institutionalization of J.H. was required as the least restrictive alternative is not supported by any substantial evidence in the record. The court therefore erred in rejecting the recommended placement in Booth.
Normally, our conclusion would require us to reverse the superior court's disposition order, with directions to effectuate the originally recommended placement. In the present case, however, at oral argument, J.H.'s counsel and her guardian ad litem both expressed concern because, now that J.H. has been placed at McLaughlin Youth Center and has become involved in a *1294 treatment program, there is a possibility that her transfer to another treatment setting such as Booth would no longer be in her best interest. Under the circumstances, we deem it best to remand this case to the superior court for an evidentiary hearing to determine J.H.'s current best interests, while leaving the superior court's original disposition order intact pending that determination. We will retain appellate jurisdiction until completion of the proceedings on remand.
This case is REMANDED.
SINGLETON, J., not participating.
NOTES
[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.
[1] The tentative draft relied on in R.P. was replaced by the approved draft, IJA-ABA Juvenile Justice Standards, Standards Relating to Dispositional Procedures (Approved Draft 1980). The approved draft adopts the substance of the least restrictive alternative approach articulated in the tentative draft. See IJA-ABA Standards §§ 2.5 B, 7.1 A 3 (Approved Draft 1980).
[2] Although J.H. spent thirty days at API and did participate in group therapy sessions and individual counseling, J.H.'s hospitalization appears to have been for observation and evaluation in light of her suicide threats, rather than for treatment of the problems that led to her runaway behavior. She was discharged when it was determined that she was not suicidal and did not suffer from any committable mental illness.