Filed 2/3/15  In re N.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.M.,<br><br>Defendant and Appellant. | E060414<br><br>(Super.Ct.No. JDSQ10710)<br><br>OPINION |

APPEAL from the Superior Court of Inyo County. Dean Stout, Judge. Affirmed with directions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Dasilva, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

Defendant N.M. was born in July 1995. In a juvenile wardship petition (Welf. & Inst. Code, § 656), it was alleged that, when defendant was 14 years old, he committed eight sexual offenses against his two younger brothers,[1] in violation of Penal Code sections 286, subdivision (b)(1); 288, subdivisions (a) and (b)(1); and 288a, subdivision (b)(1).[2] Defendant admitted guilt to four counts—two for sodomy and two for oral copulation—against each victim. (§§ 286, subd. (b)(1), and 288a, subd. (b)(1).)

Eventually, after several different placements, in November 2013, when defendant was 18 years old, the juvenile court ordered defendant be committed for five years to DJJ[3] and be given precommitment confinement credit for 328 actual days.

On appeal, defendant challenges his commitment to DJJ and contends he is entitled to 72 additional days of precommitment confinement credit. The People agree defendant should receive additional credit but assert defendant's commitment to DJJ was proper. We agree with the People and affirm the judgment, as modified, to give defendant credit for 72 additional days.

---

[1] The boys are his half-brothers and share the same mother.

[2] All statutory references are to the Penal Code unless stated otherwise.

[3] Department of Corrections and Rehabilitation, Division of Juvenile Justice, Division of Juvenile Facilities (DJJ).

FACTUAL AND PROCEDURAL BACKGROUND

The record on this case spans nearly five years between 2009 and 2014, during which time the court placed defendant in several different programs before ordering him to be placed with DJJ.

A. *First Placement—Success in Recovery*

In December 2009, defendant's half-brothers, ages seven and 10, told detectives and their father that defendant made them rub their penises against defendant's buttocks and manually and orally copulate defendant until he ejaculated. Defendant sodomized or tried to sodomize his brothers. Defendant engaged in similar behaviors with his cousins, ages three and five, in Idaho in 2007 but was never prosecuted.

Defendant's mother said defendant had been diagnosed with bipolar disorder and attention deficit hyperactive disorder (ADHD). Mother's family had a history of mental illness in her family and she had been hospitalized as suicidal. Defendant denied he had been sexually molested in the past but he admitted using alcohol and marijuana. The probation department recommended that defendant be placed in a residential treatment program specializing in juvenile sex offenders. The court declared defendant a ward of the court and removed him from his parents. Defendant was placed in a treatment program, Success in Recovery, in Visalia.

In June 2010, it was reported that defendant was adjusting slowly and displayed a high risk of reoffending. Defendant exhibited anger and anxiety and admitted to having molested a total of five victims, including his cousins and half-brothers. Defendant later

revealed that he had been raped and sodomized by his mother's neighbor for over a year. Defendant also disclosed that he had fondled his mother's breasts and genitals on numerous occasions when she was passed out from drinking. A September 2010 probation report observed defendant had trouble following basic rules and controlling his sexual impulses although he had disclosed information about the perpetrator who had sexually abused him. The court found continued placement was necessary and appropriate because defendant was making satisfactory progress to the best of his ability. In December 2010, an application regarding psychotropic medication was granted.

Between December 2010 and April 2011, defendant made progress, beginning to take responsibility for his behavior, although he still remained at high risk to reoffend. Defendant performed well in school, receiving all As and Bs. Defendant continued to receive psychotropic medication (Zoloft) for anxiety and another medication, Strattera, to improve concentration.

Defendant's progress was erratic between June and September 2011. Defendant had testified in court against the person who molested him. Defendant's mother had brought a boyfriend to court with her while defendant was testifying, causing him to be upset that she had not maintained confidentiality about his personal life. His obsessive thinking and distortions were negative and self-destructive but, by September 2011, he was complying with the rules, was less sexually obsessed, was eliminating predatory behaviors, and was addressing his feelings more openly. He continued to perform well in his independent study program.

4

In December 2011, Success in Recovery reported that defendant had regressed again, was constantly breaking the rules, and was trying to "sexually groom" staff and peers. Defendant was placed on a 14-day contract, subject to termination from the program.

In January 2012, defendant was officially terminated from the program because he could not consistently maintain honesty, follow basic rules, or refrain from sexually grooming others around him. Defendant was described as antisocial, narcissistic, and unremorseful. Based on defendant's lack of commitment, his criminality, and his lack of empathy, it was recommended he be placed in DJJ or a more highly-structured facility. A probation report called defendant "aggressive and intimidating" and stated he was "'playing the game of treatment.'"

B. *Second Placement—Quality Group Homes*

In March 2012, defendant was adjusting well in a placement with Quality Group Homes. He was academically successful and did not present any behavioral issues. However, he had been discovered smoking twice and had also had a fight with a peer. The court expressed concern about the placement and the lack of meaningful information. Defendant's smoking and marijuana use, pornography addiction, excessive horseplay and fighting, profanity, and inappropriate sexual comments were all problems. Defendant's general progress had been minimal; he violated rules, acted out sexually, and manipulated others. Defendant's medication was changed in May 2012.

In June 2012, defendant had shown an inability to cope with the structure of the program, had gone AWOL on several occasions, and had been found in possession of drugs. The court expressed its continuing concerns with defendant's placement.

On June 27, 2012, the court issued an order for arrest after defendant left the grounds of the group home and had not returned. A juvenile wardship petition alleged that defendant had violated conditions of his probation by failing to participate in individual group or family counseling, by failing to obey the rules and regulations of his group home and the directives of his probation officer, and by using or possessing an illegal or intoxicating substance. Defendant was ordered detained. Defendant told the probation officer that he had run away because he was tired of fighting and his possessions being stolen. The staff did not respond to him and he did not believe he was benefitting from the counseling; he needed a more therapeutic setting.

On July 6, 2012, defendant was placed in the Inyo County Juvenile Detention Center. A termination notice from Quality Group Homes reported that defendant's probation was violated and his placement was terminated. However, a second letter was sent to probation recommending that he be returned to Quality Group Homes. The letter comments on defendant "putting genuine effort into our sexual offender curriculum," "tak[ing] responsibility for his past sexual misconduct," being "forthcoming" about personal issues, and "beginning to acknowledge his problematic involvement with pornography" and substance abuse. Defendant had been "acting out" because new residents had affected his behavior.

6

*C. Third Placement—Mathiot Residential Treatment Center*

The probation officer recommended that defendant be placed at Mathiot Residential Treatment Center for "sexually at-risk adolescent males." The court warned defendant that he needed to take the program seriously or he would be placed with DJJ. Defendant signed new terms and conditions.

Mathiot Group Homes reported in October 2012 that defendant was having behavioral problems, including defiance of rules, sexualized talk with peers, sexually explicit entries in his journal, and physical contact with girls at school. In December 2012, defendant was having suicidal ideations; he was depressed and found in possession of marijuana and pornography. In January 2013, a new medication was added for ADHD.

On January 29, 2013, a juvenile wardship petition was filed alleging that defendant had violated probation conditions by failing to obey school rules and regulations and by possessing or being under the influence of an illegal or intoxicating drug. Defendant admitted the allegations and was ordered to serve 14 days in juvenile hall and then be released back to Mathiot Group Homes.

In March 2013, defendant's status was described as "an inconsistent engagement in treatment with periods of instability including involvement with substance abuse, shoplifting, suicidal ideation, self-mutilation, AWOL, and unauthorized community contact." He was hospitalized for a panic attack after a romantic disappointment. He was failing school. In April 2013, his medications for depression and anxiety were changed.

7

In May 2013, defendant left his placement for three nights and he violated probation conditions by failing to complete the juvenile sex offender program, by failing to be in his residence between 8:00 p.m. and 6:00 a.m., and by using or possessing amphetamine. Defendant admitted using marijuana and getting into an altercation at the park. He felt he had benefitted from sex offender treatment but that he needed treatment for other behaviors, including drug use and anger.

*D. Commitment to DJJ*

Defendant's placement at Mathiot was terminated and defendant was detained in Inyo County Juvenile Center. The discharge summary from Mathiot Group Homes reported that, during defendant's final week, he repeatedly went AWOL for extended periods of time, engaged in marijuana and tobacco use, and was physically violent in the community.

In August 2013, another notice of probation violation was filed, noting that defendant possessed pornographic materials and had violated the detention rules. Defendant had made multiple threats and attempts to commit suicide.

Defendant graduated from high school in September 2013. In October 2013, defendant submitted a letter to the court, stating that he had learned a lot about his sexual offense and his own victimization. He hated himself for the effect that he had on the victims and on his family and he wanted to go to college and help his family. He also planned to stay out of trouble and continue counseling. A therapist submitted a letter in support for defendant, including information about possible placements.

8

On November 7, 2013, the probation officer filed a disposition report. The probation officer stated that defendant's needs would best be served by the "intensive, structured, and secured programming" available through DJJ. It further commented that, as defendant's offenses were committed before the age of majority, it was not appropriate to place him in a treatment program designed for adults. The availability of placement options in the form of a group home/residential treatment was virtually nonexistent.

At the disposition hearing on November 22, 2013, the court took judicial notice of the entire court file and stated that it had read and considered the probation officer's disposition hearing report. Defense counsel submitted Doctor Minagawa's report. Defendant's therapist testified she had noticed considerable and dramatic changes in defendant since she had first met him at age 14. Defendant was more mature, admitted what he had done, felt remorse, and was able to talk about his feelings and thoughts surrounding his actions and his own victimization. He was also able to ask for help.

Defendant's grandparents had informed probation that they were no longer able to provide a home for defendant. The court planned to follow probation's recommendation and place defendant with DJJ because the court was not convinced there was a viable alternative. Therefore, the court ordered that defendant be committed to the DJJ for a term of five years. Defendant was awarded precommitment confinement credits for 328 actual days. Defendant was required to register as a sex offender under section 290.

On January 15, 2014, the probation department sent a memorandum to the court, noting that DJJ would be accepting defendant, despite its initial indications that it would be rejecting the case. On January 30, 2014, the court had received correspondence from

9

DJJ indicating that defendant had been accepted but he had not yet been transferred. In view of the delay and the uncertainty of an alternative program, defense counsel asked the court to reconsider its order. The court questioned whether it had jurisdiction, given that an appeal had been filed and it did not have sufficient information or an appropriate motion for reconsideration. Therefore, the court denied the oral request, without prejudice. Defendant was transferred to DJJ and arrived on February 3, 2014.

III

EX POST FACTO PRINCIPLES

Defendant argues the juvenile court's commitment of defendant to DJJ, based on the 2012 amendments of Welfare and Institutions Code sections 731 and 733 was an ex post facto application of the law because his offenses were committed in 2009 before the statutes were amended to include his crimes.

Defendant acknowledges the same arguments he asserts here have already been rejected in two appellate cases. In *In re Edward C.* (2014) 223 Cal.App.4th 813, 823, the First Appellate District, Division Five, noted that Welfare and Institutions Code section 731, subdivision (a)(4), as enacted in 2007, purported to authorize DJJ commitments for youthful sex offenders only when the minor had committed an offense listed in Welfare and Institutions Code section 707, subdivision (b). The court further noted that while Welfare and Institutions Code section 707, subdivision (b), lists 30 serious and violent crimes, including many forcible sex offenses, it does not include a number of nonforcible sex offenses that are listed in section 290.008, subdivision (c), as referenced in Welfare and Institutions Code section 733, subdivision (c). (*Edward C.,* at p. 823.) The *Edward*

10

court found the Legislature enacted Assembly Bill No. 324 (2011–2012 Reg. Sess.) to amend Welfare and Institutions Code section 731, subdivision (a)(4), to authorize a DJJ commitment when the ward "'has committed an offense described in subdivision (b) of Section 707 *or subdivision (c) of Section 290.008 of the Penal Code*, and is not otherwise ineligible for commitment to the division under Section 733.'" (*Edward C.,* at p. 824, citing Stats. 2012, ch. 7, § 1.) The court noted that the amendment clarified that a DJJ commitment is authorized for a ward who committed a sex offense listed in section 290.008, subdivision (c), even if the offense was not also listed in section 707, subdivision (b). (*Edward C.,* at p. 824.)

The *Edward C.* minor argued that in committing him to DJJ, the juvenile court retroactively applied the 2012 amendment to section 731, subdivision (a)(4), and inflicted a greater punishment than was available when he committed his offenses of continuous sexual abuse of a child in 2008 and 2009. (*In re Edward C., supra*, 223 Cal.App.4th at pp. 818, 825.) The court found there was no ex post facto problem because a DJJ commitment does not constitute greater punishment than the local commitments that were available when the minor committed the offenses. (*Id.* at p. 825.) The court rejected the argument that, because a juvenile committed to DJJ for a sex offense enumerated in section 290.008 must register as a sex offender upon release, whereas wards placed locally for the same sex offenses are not required to register, a commitment operated to increase punishment. (*Id.* at p. 827.) In *In re K.J.* (2014) 224 Cal.App.4th 1194, 1202-1211, the First Appellate District, Division Three, also concluded that the

11

legislature intended Assembly Bill 324 to be retroactive and that it did not violate ex post facto principles.

Here defendant argues *Edward C.* and *K.J.* were wrongly decided and he seeks to preserve this issue for further review, especially whether the discretionary imposition of lifetime sex offender registration (§ 3003.5, subd. (b)) increases the "penalty" for the offense within the meaning of *Apprendi v. New Jersey* (2000) 530 U.S. 466, an issue which is currently pending in the California Supreme Court in *People v. Mosley*, S187965. We agree with the analysis in *Edward C.* and *K.J.* and reject the ex post facto argument attempted here.

## IV

## ABUSE OF DISCRETION

The juvenile court found there were no programs suitable for placement of defendant and it had no option other than to commit defendant to DJJ. Defendant maintains the court's conclusion was wrong and its decision was an abuse of discretion: "An appellate court will not lightly substitute its decision for that rendered by the juvenile court. We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citation.] In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purpose of the Juvenile Court Law." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395; *People v. Giminez* (1975) 14 Cal.3d 68, 72.) Because commitments to DJJ cannot be based solely on retribution grounds (Welf. & Inst. Code, § 202, subd. (e)(5)), there

12

must be evidence demonstrating (1) probable benefit to the minor and (2) that less restrictive alternatives are ineffective or inappropriate. (*Michael D.,* at p. 1396.)

During the disposition hearing, defendant's counsel argued defendant's original offenses happened when defendant was much younger and that defendant was himself a victim of neglect and sexual abuse with a history of mental illness. Defendant's failure in three placements was understandable. In his first placement, he was disturbed after having to testify about being abused. In his second placement, the group home ultimately asked the court to let him stay in the program. In spite of his misconduct in the third placement—possessing pornography, shoplifting, and going AWOL—defendant did not commit any additional sexual offenses. Counsel contended there were many alternatives and defendant would not simply be turned loose into the community. She asserted the recommendation for DJJ was the most restrictive and least appropriate alternative because DJJ is for severe offenders and its inmates are "hardened."

The district attorney agreed that defendant needed a great deal of support, comprehensive care, psychiatric and substance abuse monitoring, and an effective sex offender treatment program. The district attorney did not perceive any legitimate option other than DJJ.

Defendant addressed the court, taking responsibility for his actions and for missing past opportunities. He claimed that, because his offenses were four years old, he honestly felt that he had changed and would not reoffend.

The probation report explained that, because defendant had been abused himself, he thought sexual behavior between boys was acceptable which was why he approached

13

his younger cousins in Idaho. In addition, when he was 12 years old, he was raped and sodomized by his mother's friend for over a year.

The court stated that defendant was a victim himself and the court respected and appreciated his acceptance of accountability and responsibility. The court however, was not convinced there was a viable alternative to DJJ because there were mental health, behavioral health, substance abuse needs, and sexual offender components. The court had reviewed the materials from DJJ and was satisfied that defendant's needs would be met best through its services. Therefore, the court ordered defendant be committed to DJJ.

On appeal, defendant argues the trial court abused its discretion because there was no guarantee that defendant would be accepted into DJJ programs or that they would continue to exist, given budgetary problems and reductions. Defendant asserts there was evidence of less restrictive alternatives, such as a residential drug treatment program with a comprehensive care program and outpatient sex offender treatment; continuing at juvenile hall where he was making progress; or even housing at a DJJ facility without a DJJ commitment and no requirement to register as a sex offender. (*In re Edward C., supra,* 223 Cal.App.4th at pp. 826-827, citing *In re Robert M.* (2013) 215 Cal.App.4th 1178, 1182-1183.)

Welfare and Institutions Code section 734 states, that the court must be satisfied, that it must be "probable" that the ward will benefit from the treatment provided by the DJJ. Section 734 states in relevant part: "No ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is fully satisfied that the

14

mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefitted by the reformatory educational discipline or other treatment provided by the Youth Authority." Therefore, defendant urges it was reversible error to commit defendant to DJJ for the sole reason that suitable alternatives did not exist. (*In re Aline D.* (1975) 14 Cal.3d 557, superseded by statute on other grounds as stated in *In re Luisa Z.* (2000) 78 Cal.App.4th 978.)

In *In re Aline D., supra*, 14 Cal.3d 557, Aline was expelled from four placements because of behavior, including gang association, shoplifting, marijuana use, and refusal to attend school. The only remaining home would not accept her because of her past "assaultive behavior." (*Id.* at p. 560.) At the placement hearing, seven placements were deemed unsuitable and one was specifically not suitable because it was not a locked facility. (*Id.* at p. 561.) Two psychiatrists and one psychologist recommended that Aline not be committed to Youth Authority (YA). The juvenile court referee stated that Aline could not simply be left in juvenile hall because that was a detention facility. The referee committed Aline to YA because it was the only alternative other than setting her free and she would *probably* benefit from YA commitment. (*Id.* at pp. 561-562.) The Supreme Court reversed the commitment order, stating: "[A] CYA commitment may not be made for the sole reason that suitable alternatives do not exist." (*Id.* at p. 562.) As part of its decision, the Supreme Court relied on the former premise that a YA commitment was solely for rehabilitation and not punishment. (*Id.* at p. 567.)

This case, however is not like *Aline D.* because she was a mentally impaired individual unsuitable for YA commitment. Although defendant appears to be extremely

15

troubled, his placements failed because he was defiant and uncooperative. Furthermore, the juvenile court positively concluded that DJJ commitment would provide the structured environment for treating his substance abuse and sexual deviancy. The juvenile court did not commit an abuse of discretion.

V

PRECOMMITTMENT CONFINEMENT CREDITS

Defendant was given 328 days of precommitment confinement credit. According to the probation report, defendant served: 109 days between January 29, 2010, and May 17, 2010; 33 days between July 1, 2012, and August 2, 2012; and 186 days between May 21, 2013, and November 22, 2013, for a total of 328 days. Defendant was not actually transferred from the Inyo County Juvenile Center to DJJ until February 3, 2014. Therefore, defendant is entitled to 72 additional days of credits from November 22, 2013 until February 2, 2014, for a total of 400 actual days of credit. (*In re Eric J.* (1979) 25 Cal.3d 522, 536.) The People agree. The appellate court may correct the calculation error without a remand to the juvenile court. (*In re Antwon R.* (2001) 87 Cal.App.4th 348, 353.)

VI

DISPOSITION

We affirm defendant's commitment to DJJ. We direct the juvenile court to prepare an amended commitment order providing that defendant is entitled to an

additional 72 days of precommitment confinement credit.  The amended order shall be forwarded to DJJ.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:

<u>HOLLENHORST</u>
Acting P. J.

<u>KING</u>
J.