Filed 9/19/24  In re T.J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re T.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.J.,<br><br>        Defendant and Appellant. | A168593<br><br>(Alameda County<br>Super. Ct. No. JV03132608) |

In April 2023, when he was sixteen years old, defendant T.J. entered a gas station while armed with a gun, struck the attendant in the face with the gun, and fled the scene after taking money from the register.  After T.J. admitted to assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), the juvenile court committed T.J. to Secure Track, Alameda County's secure youth treatment facility.  T.J. appeals, arguing the juvenile court abused its discretion in finding that a less restrictive, alternative disposition would not be suitable.  We affirm.

### BACKGROUND

**The Shell Station Incident**

On April 22, 2023 at around 2:25 a.m., T.J. and another male entered a Shell gas station in Oakland, approached the counter, and requested a gas

1

can from the attendant.  When the attendant opened the side door to hand the gas can, T.J. and the other male each pointed a handgun at the attendant and forced their way into the cashier's area.  They demanded the attendant open the safe, but the attendant did not know its code.  Both T.J. and the other male then hit the attendant on his face with their handguns.  The two suspects opened the cash register, took $700 in cash, and fled the scene in a vehicle.  The attendant sustained bruising to his face.

T.J. was arrested one month later after police saw him exiting a car that was used in an armed robbery.  A search of the vehicle revealed a semi-automatic pistol.

**The Charges**

On May 24, the Alameda County District Attorney filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a))[1] charging then 17-year-old T.J. with second degree robbery (Pen. Code, §§ 211) (count one); assault with a firearm (*id.*, §§ 245, subd. (a)(2)) (count two); carrying a concealed loaded firearm within a vehicle (*id.*, § 25400, subd. (a)(1) (count three); possessing an assault weapon (*id.*, § 30605, subd. (a)) (count 4); and carrying a loaded and unregistered firearm on his person in a public place (*id.*, § 25850, subd. (a)) (count 5).  The petition also alleged various firearm use and possession enhancements.

On June 29, T.J. admitted to assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4))—a lesser included offense of count two—in exchange for the dismissal of the remaining counts and enhancements.  The juvenile court (the Honorable Scott B. Jackson) accepted the admission and set a dispositional hearing for July 17.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

**The Dispositional Hearing**

On July 13, 2023, the probation officer filed a dispositional report. The report detailed T.J.'s prior probation history beginning on August 12, 2019,[2] when he was declared a ward after admitting to grand theft of another person (Pen. Code, § 487, subd. (c)). Nearly two years later, on July 7, 2021, T.J. admitted to first degree burglary (Pen. Code, § 459). And on March 28, 2022, he admitted to second degree robbery (Pen. Code, § 211). In addition, T.J. was twice found in violation of probation.

T.J.'s first out-of-home placement was at Boys Republic in September 2021, following the burglary offense. He absconded after three days. T.J. was then taken into custody at the Juvenile Justice Center where he remained until November 16, 2021, at which point he returned to Boys Republic. On December 7, 2021, T.J. again absconded.

On June 2, 2022, following the second degree robbery offense, T.J. was placed at Rite of Passage (ROP). He initially struggled to adjust to the rules and norms of the program. But with continued support and treatment from his treatment team, he "learned to utilize positive social skills and began to have more positive interactions with others. While in placement he was able to work on his poor impulse control, poor decision-making, and poor problem-solving skills. His progress was measured by the completion of his treatment groups, which were aimed at him learning better conflict resolution, effective communication, and improved interactions with peers and authority figures." On January 31, 2023, T.J. completed the program and returned to the home of his mother.

On May 22, 2023, T.J. was arrested for the assault in the instant case.

---

[2] The report refers to the year "2029," which presumably was a typographical error.

The assault was T.J.'s "19th referral" to the probation department. He has been on probation since 2019.

The dispositional report also documented T.J.'s family history. T.J.'s parents together raised nine children, including T.J. The family was referred to Child Protective Services approximately 25 times. Two allegations of general neglect by T.J.'s mother were substantiated. T.J.'s parents also had a history of domestic violence in the home. The probation officer observed that while the family was "close-knit," T.J.'s parents needed "[t]o be more available for [him]." T.J. himself has a son, born in September 2022.

In addition, the report noted that T.J. was involved with the "Stubby" gang. He also suffered traumatic experiences such as being shot in the neck, and his friends dying due to gun violence. T.J. also used marijuana daily. T.J. was found to be at medium risk for recidivism within the next year.

The probation officer recommended that T.J. be committed to Secure Track. She reported: "The youth's matter was screened for Secure Track; he was approved for Secure Track. The youth has been to Placement and completed the program, however, he continues to offend . . . . [He] was armed and continues to associate with the Stubby gang. [T.J.] has proven he was not rehabilitated, as this is his third sustained Felony offense."

In addition to citing T.J.'s history of offenses and probation violations, the report justified the recommendation for Secure Track based on the following:

"The youth lacks structure in the home. The violence experienced in the home coupled with other traumas throughout his life appears to have played a significant role in his behaviors. He self-medicates daily smoking marijuana and remains connected to the Stubby gang members and associates. The youth absconded twice from court-ordered out-of-home

4

placements. After being continued in placement for the third time, the youth successfully completed the program; however, shortly thereafter he was arrested for the instant offense.

"Despite fathering an eight-month-old son, the youth continues to engage in negative and risky behaviors. The SOS [(Screening for Out of Home Placement)] Committee recommends a commitment to the Secure Track Program which offers several evidence-based therapeutic services, including Rites of Passage (ROP): Culturally Responsive Cognitive Behavioral Therapy, Growth Restores Our Worth (G.R.O.W.): Life Skills/Social — Emotion Development, Raising Leaders: Employment and Career Pathways, a Fatherhood Program, and TRUE Academy: Gang Intervention and Anger Management. Secure Track will address his drug use as well as develop [his] decision-making skills, peer relations, life skills, and most importantly his parenting skills. Secure Track will enable the youth to focus on his needs absent the distraction of his peers and the community."

At the dispositional hearing on July 17, T.J.'s attorney requested that he be placed at Camp Sweeney instead of Secure Track. The People joined in the recommendation of the probation department for Secure Track. The juvenile court noted that the probation officer did not explain why a referral to Camp Sweeney would not be appropriate. Therefore, the court continued the hearing to July 21 to allow probation to provide such an explanation.

On July 20, the probation officer submitted a memorandum, which reiterated her recommendation for T.J.'s commitment to Secure Track and included the following:

"On July 6, 2023, the youth's matter was screened with the [SOS] committee; Secure Track was deemed the most appropriate for the youth. He

5

could receive intensive services in a controlled environment which will prevent him from absconding and placing himself and the community at further risk. The least restrictive option of Camp Sweeney was discussed but given the youth's AWOL history and the seriousness of his offense, armed robbery of a business, and striking the victim in the face with a firearm, Secure Track was recommended. The youth has twice absconded from Court ordered STRTP [(Short-Term Residential Therapeutic Program)] placements. After being continued in placement for the third time, the youth successfully completed the STRTP placement; however, shortly after returning home, he was arrested for the instant offense. This is the youth's third sustained felony offense, which, unfortunately, despite supportive services afforded, the youth has not been rehabilitated. The youth does not have structure and support in the home of his parents, and[ ] the domestic violence experienced in the home, coupled with other traumas throughout his life, appears to have played a significant role in his current behaviors. Camp Sweeney requires a parent to be involved and active in the program and historically there has not been a parent that has been active and supportive in his rehabilitation.

"On July 20, 2023, a further SOS discussion was held concerning the appropriateness of Camp Sweeney. While similar programming can be offered to the youth at Camp Sweeney, his AWOL history and present offense are of great concern to the committee. The youth's offenses are increasing in sophistication and would be putting the community at risk if he were in an open setting such as Camp Sweeney, where he could easily walk away and return to Oakland.

"Entering and robbing a business at gunpoint and striking the Victim in the face with a firearm is a bold and egregious offense. The youth needs to acknowledge the gravity and risk he posed to the Victim and himself

6

possessing a firearm.  The youth's behavior has continuously escalated over the years with 19 referrals to the Probation Department.  The youth has failed to realize the trauma he is causing his victims.

"At this time, it appears the Secure Track Program will assist the youth with his rehabilitative needs in a secure structured environment to help him accomplish set goals to become a productive member of the community.  Secure Track will enable the youth to focus on his treatment goals and needs.  It is hoped that the youth maximizes the opportunity while in Secure Track to be held accountable, begin self-reflection and healing, work on decision-making skills, and peer relations, obtain life skills and strengthen his parenting skills, as well as address his substance misuse."

The continued dispositional hearing came on as scheduled, on July 21.  T.J.'s mother appeared telephonically.  T.J.'s father also called in telephonically to inform the court that he was walking to the courthouse and was "two minutes" away.  While on the record, T.J.'s father asked Judge Jackson, "How you been, man?" Judge Jackson replied, "I've been good, man. . . .  I haven't seen you since pre-COVID," before a discussion off the record took place.

When back on the record, T.J.'s attorney again requested that T.J. be placed at Camp Sweeney.  And again, the People joined in probation's recommendation for Secure Track.  After hearing the arguments of the parties, the juvenile court made the following comments:

"[T]he problem with [T.J.], when he comes back into the community, someone ends up getting hurt, and I can't afford to do that. . . .  [¶]  He did succeed at that placement, and I, of all people—you know, this is one thing about being a juvenile judge, you stay with the families; you stay with these families forever.  I've been with [T.J.] since 2019.  I really care about this

7

family.  I know all the boys.  I know all the kids.  I've known the kids that have been born in front of me, basically.  I know what's happening.  I know what's happening with the family.  [¶] . . . [¶]

"[On April 22, 2023,] [T.J.] commits this offense and someone got hurt.  I can't afford that; the community can't afford it.  And there's no one that's rooting more for this family or for [T.J.] than me.

"You know, as you heard before we got back on the record, I had a long conversation with dad.  I told him I haven't seen him in a while.  And Mom, you know, as you know, is sporadically involved. . . .  We can sometimes get in touch with them; sometimes can't.  A lot of times can't.  She's not here today because she's ill, which is fine, so we're on the phone with her.

"But the reality of it is . . . that it's just not happening, and the rehabilitation is just not happening.  And for whatever reason, they have a lot going on in that house.  And for whatever reason, Mom and Dad aren't really stepping up, and Camp requires that.  You know, that's one of the things, Camp really requires the family step up and come to the forefront and be co-partners in all of this. . . . [¶] . . . [¶]

"And this family, who I care a lot about, they've just never been able to really step up and help their children.  And what ends up happening is that someone in the community ends up getting hurt. . . .  I've given [T.J.] tons of chances.

"This is . . . his 19th referral.  This is Petition 8—[¶] . . . [¶] with escalating and escalating and escalating behavior.  And it's just—you know, it's sad.  It's one of those situations where the Court doesn't want to do it but just feels compelled to do it because nothing seems to stick.

". . .  I was so proud of [T.J.]  You know, he did so well at that placement, and then again, he comes back into the community, and . . .

someone else is getting hurt.  And so we need to take, you know, more structured, serious intervention at this time."

The court then stated it had read and considered the probation department's disposition report and supplemental memorandum and "any other relevant, material evidence."  It also took judicial notice of "all prior findings, orders, and judgments in this proceeding."  The court announced its dispositional findings:

"[T.J.] is continued to be declared a ward of the Court.

"The most recent adjudicated offense . . . [,] a [Penal Code section] 245(a)(4), assault with force likely to produce great bodily injury[,] is a [section] 707(b) offense.

"The Court has considered a number of factors, including the severity of the offense, including the youth's role in the offense, the youth's behavior, and the harm done to the victims;

"The youth's previous delinquent history, including adequacy and success of previous attempts by the juvenile Court to rehabilitate the youth, whether the programming, treatment, education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and secure needs of the youth, whether the goals of rehabilitation, community safety can be met by assigning the youth to an alternative, less restrictive disposition available to the Court.

"The Court has also considered the youth's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety and suitability of committing the youth to a term of confinement in a secure youth treatment facility.

"The Court finds that a less, restrictive, alternative disposition isn't

9

suitable.  [¶]  The youth is committed to the Secure Youth Treatment Facility."  The court set the baseline term of commitment as four years.

This timely appeal followed.

## DISCUSSION

### Standard of Review and Applicable Law

"[T]he juvenile court has long enjoyed great discretion in the disposition of juvenile matters . . . ."  (*In re Greg F.* (2012) 55 Cal.4th 393, 411.)  It has " 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' "  (*Ibid*.)  We review a commitment decision for abuse of discretion and factual findings for substantial evidence, indulging all reasonable inferences to support the juvenile court's decision.  (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; *In re Carlos J.* (2018) 22 Cal.App.5th 1, 5 (*Carlos J.*); *In re Khamphouy S.* (1993) 12 Cal.App.4th 1130, 1135 [decision affirmed unless the court "acted beyond the scope of reason"].)

The purpose of juvenile law guides our examination of the record.  (*In re Calvin S.* (2016) 5 Cal.App.5th 522, 528.)  The law provides that removal may be necessary for a minor's "welfare or for the safety and protection of the public."  (§ 202, subd. (a).)  Delinquent minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances.  This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter."  (*Id.*, subd. (b); see *In re Eddie M.* (2003) 31 Cal.4th 480, 507 [court may choose custodial confinement "to hold juveniles accountable for their behavior, and to protect the public"].)

Until recently, the Division of Juvenile Justice (DJJ) was "the state's most restrictive placement for its most severe juvenile offenders . . . ."  (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902.)  "The DJJ is also known as the

10

California Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF). [Citation.] DJJ and DJF are used interchangeably in case law." (*In re J.B.* (2022) 75 Cal.App.5th 410, 413, fn. 1.) "The DJJ was previously known as the California Youth Authority." (*In re Miguel C.*, *supra*, 69 Cal.App.5th at p. 906, fn. 4.)

In 2020 the Legislature enacted "juvenile justice realignment" by passing Senate Bill No. 823 (2019–2020 Reg. Sess.). (Stats. 2020, ch. 337.) Implementing the Legislature's juvenile justice realignment program required the eventual closure of the DJJ and the devolution of its responsibilities onto California's counties. (§ 736.5, subd. (a).) This development in juvenile justice realignment added section 875 et seq., which provides that beginning on July 1, 2021, in addition to other types of treatment, the court may order a ward to be committed to a secure youth treatment facility, the county level equivalent of the DJJ and also known as "Secure Track." (§ 875, subd. (a); *In re J.B.*, *supra*, 75 Cal.App.5th at p. 427, fn. 12.) The Legislature closed the DJJ effective June 30, 2023. (§ 736.5, subd. (e); Stats. 2021, ch. 18, § 10.)

In the context of Secure Track commitments, section 875, subdivision (a)(3) (section 875(a)(3)) requires the juvenile court to make "a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable. In determining this, the court shall consider all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case. The court shall additionally make its determination based on all of the following criteria: [¶] (A) The severity of the offense or offenses, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous

11

delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875(a)(3).)

**The Juvenile Court Did Not Abuse Its Discretion**

Here, the record reflects that the juvenile court considered all the relevant evidence and the criteria set forth in section 875(a)(3) in finding that a less restrictive, alternative disposition would be unsuitable for T.J. Substantial evidence supports that determination.

The evidence shows that T.J.'s present offense of assault by force likely to produce great bodily injury was a serious offense; he pistol-whipped the victim on his face, injuring him. The record also reflects a prior delinquent history since 2019, a series of failed efforts to rehabilitate T.J. in multiple placements, a history of absconding from less restrictive placements, and a pattern of criminal behavior over the course of the wardship that was escalating in severity.

In addition, T.J. experienced violence and lacked structure in his home. He suffered from other traumatic experiences such as being shot in the neck and losing friends to gun violence. He was involved in a gang. And he used marijuana daily to self-medicate. T.J. was also raising a young son, but continued to engage in negative and risky behaviors. As reported by the

12

probation officer, Secure Track provided therapy and specific programs that would address T.J.'s needs concerning his substance misuse, decision-making skills, gang affiliation, anger management, parenting skills, and employment.

Although the less restrictive alternative of Camp Sweeney had similar programs, Camp Sweeney also required active family involvement and support. Unfortunately, in the probation officer's view, it was unlikely that T.J.'s parents would provide him with the proper support given they had not previously shown up for him in that regard. Beyond that, considering T.B.'s history of absconding from past placements and the seriousness of his present offense, the probation officer determined the community would be at risk if T.J. were placed in an open setting such as Camp Sweeney where he could easily walk away.

All of this supplies substantial evidence to support the juvenile court's conclusion "that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875(a)(3).) Thus, the court was well within its discretion in committing T.J. to Secure Track.

T.J.'s counterarguments do not convince us otherwise. First, T.J. argues the juvenile court improperly relied on facts outside the record relevant to the criterion in section 875(a)(3)(D) of whether the goals of rehabilitation and community safety can be met by an alternative, less restrictive placement. Second, he argues "the record . . . is fatally short of evidence relevant to" the criterion in section 875(a)(3)(C) of whether the programs and treatment provided at Secure Track would meet his needs.

We address T.J.'s second contention first. T.J. maintains that the probation reports did not contain enough information about the programs at Secure Track. Relying on *Carlos J.*, he argues the probation officer "should have explained the activities that these programs entail, the number of hours

13

of therapy that these programs would provide to T.J., and how the programs would meet T.J.'s needs." Additionally, T.J. argues that a commitment to Secure Track could expose him to "peer contagion" from other youth with more serious offenses, and that in light of that circumstance, the juvenile court should have taken evidence on whether placing him "at Secure Track would make him worse. . . ."

In *Carlos J.*, the probation officer recommended commitment to DJF based on the minor's underlying offense (assault with a firearm) and gang association. (*Carlos J.*, *supra*, 22 Cal.App.5th at pp. 4, 7.) The probation department recommended the DJF, citing the gravity of the offense and indicating gang intervention services were warranted, but not mentioning *any* specific programs at the DJF that could provide such services. (*Id.* at pp. 7–9.) Moreover, a psychologist opined the minor needed treatment for PTSD and discouraged a commitment to the DJF. (*Id.* at p. 8.) The juvenile court committed the minor to the DJF, concluding " 'the youth will benefit from the reformatory, discipline or other treatment provided by the [DJF].' " (*Id.* at p. 9.) Division Five of this court reversed, finding no substantial evidence of probable benefit under section 734[3] and remarking, "there must be *some* specific evidence in the record of the programs at the DJF expected to benefit a minor." (*Id.* at p. 10.) Without such evidence, the appellate court held, it could not "review the adequacy of the evidence supporting the finding" of probable benefit. (*Ibid.*)

---

[3] Section 734, which applies to DJJ commitments, provides that "[n]o ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority."

Though the court declined to create any bright line rule about how much evidence was enough for commitment, it explained that with regard to the initial showing required to support a DJF commitment, "it is reasonable and appropriate to expect the probation department, in its report or testimony, to identify those programs at the DJF likely to be of benefit to the minor under consideration." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 12.) "Where a minor has particular needs, the probation department should also include brief descriptions of the relevant programs to address those needs." (*Ibid*.)

Nevertheless, the *Carlos J.* court made clear that "the probation department is not required in its report and initial testimony to provide in[-]depth information about the DJF's programs or to preemptively respond to even predictable criticisms of the DJF. Under Evidence Code section 664, where the probation officer has identified programs of benefit to a minor and provided brief information about the most important programs, it may be presumed the probation officer's recommendation is based on an assessment the programs are available and appropriate. If a minor wishes to dispute the availability or efficacy of particular programs, or to suggest that other conditions at the DJF undermine the programs, the minor must present sufficient evidence to reasonably bring into question the benefit he or she will receive from the adoption of the probation department's recommendation." (*Carlos J., supra*, 22 Cal.App.5th at p. 13.)

In stark contrast to *Carlos J.*, where there was "*no* specific information in the record regarding the programs at the DJF" (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 4, italics added), here, the probation officer's dispositional report identified the programs at Secure Track expected to address T.J.'s needs. Specifically, the report states: "The SOS committee is recommending

15

a commitment to the Secure Track Program which offers several evidence-based therapeutic services, including Rites of Passage (ROP): Culturally Responsive Cognitive Behavioral Therapy, Growth Restores Our Worth (G.R.O.W.): Life Skills/Social – Emotion Development, Raising Leaders: Employment and Career Pathways, a Fatherhood Program, and TRUE Academy: Gang Intervention and Anger Management. Secure Track will address his drug use as well as develop the youth's decision-making skills, peer relations, life skills, and most importantly his parenting skills. Secure Track will enable the youth to focus on his needs absent the distraction of his peers and the community." These descriptions of the relevant programs to address T.J.'s needs, though brief, satisfy the standard set forth in *Carlos J.* for the People's burden of showing the appropriateness of a proposed placement. (*Carlos J.*, at p. 12.)

T.J. nonetheless argues the probation officer should have provided additional information such as the specific activities and number of hours involved in the identified programs at Secure Track. But *Carlos J.* forecloses such an assertion. Where, as here, the probation department has identified and provided brief information about the relevant programs, "it is *not* required . . . to provide in[-]depth information about [Secure Track's] programs or to preemptively respond to even predictable criticisms of [Secure Track]." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 13, italics added.)

Next, T.J. notes that " '[n]umerous studies . . . indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of juvenile delinquency.' " (*Miller v. Alabama* (2012) 567 U.S. 460, 472, fn. 5.) He then argues that because a commitment to Secure "can undoubtedly cause 'peer contagion,' " the juvenile court should have taken more evidence on whether such a commitment "would make him worse." We

16

are unpersuaded.

In *Carlos J.*, the minor on appeal relied on articles and reports describing similar studies and argued that "it was critical for the record to contain some specific information about the DJF's gang intervention programming in light of the risk that juveniles confined in institutions such as the DJF may become more entrenched in criminality." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 13.) The *Carlos J.* court declined to consider such materials, as they were not presented to the juvenile court and, in any event, were unnecessary to its decision. (*Id.* at p. 13, fn. 8.) The appellate court, however, noted: "Those sorts of materials, or testimony along similar lines, *if properly presented to the juvenile court at the time of disposition*, would then obligate the People to present more in-depth information about the DJF in order to show probable benefit." (*Id.* at pp. 13–14, italics added.) "The bottom-line is that, where a minor has concerns about a particular aspect of the DJF and *presents evidence supporting those concerns*, it may be necessary for the People to provide additional information to the juvenile court in order for the court to make a properly supported finding of probable benefit." (*Id.* at p. 14, italics added.)

Here, at the dispositional hearing, while T.J.'s counsel expressed a concern that a Secure Track commitment would subject T.J. to other youth with more serious charges and cause him to "be further institutionalized" , she did not present any evidence supporting those concerns. Thus, contrary to T.J.'s suggestion, the People were not obligated to provide additional information on Secure Track's programs beyond what was already presented in the probation officer's reports. (See *Carlos J.*, *supra*, 22 Cal.App.5th at pp. 13–14.)

Accordingly, *Carlos J.* does not provide a basis for reversing the order

17

committing T.J. to Secure Track.[4]

Nor are we persuaded by T.J.'s criticism that the names of the relevant Secure Track programs identified in the probation reports "sound more like woke jargon than like real programs." Although T.J.'s counsel expressed concerns about the overall setting of Secure Track, she did not question the legitimacy of the particular programs it offered. In fact, it appears counsel held the opposite view. One of counsel's arguments in favor of placement at Camp Sweeney was the fact that it had some of the same or similar programs as Secure Track—an implied acknowledgment that the programs were appropriate and that T.J. would benefit from them. Thus, any suggestion on

_____

[4] T.J. also cites *In re C.H.* (2011) 53 Cal.4th 94 and *In re Aline D.* (1975) 14 Cal.3d 557 to argue that "the California Supreme Court has likewise repeatedly recognized that less criminally oriented youths are permanently damaged by exposure to youths who have become hardened criminals." T.J. overstates the holdings of those cases, which are in any event inapposite. In *In re Aline D.*, the court did not make the sweeping proposition that T.J. says it did. Instead, there was specific evidence from a psychologist's report that the minor *in that case* was "not truly delinquent and that involvement with more delinquent and criminally oriented youths may adversely influence her." (*In re Aline D.*, *supra*, 14 Cal.3d at p. 561.) Similar evidence was not presented in this case. In *In re C.H.*, the high court held that a juvenile court lacked authority to commit a ward to the DJF under section 731, subdivision (a)(4) where the ward was never adjudged to have committed an offense described in section 707, subdivision (b), even if the ward's most recent offense was a sex offense as referenced in section 733, subdivision (c). (*In re C.H.*, *supra*, 53 Cal.4th at pp. 97–98, 108.) In interpreting sections 731, subdivision (a)(4) and 733, subdivision (c), the court considered the legislative history, which indicated that the "Legislature's choice to restrict the class of juvenile offenders eligible for commitment to the DJF serves to protect less serious youthful offenders (those who have not committed § 707(b) offenses) by ensuring they are not housed with and exposed to the more serious juvenile offenders committed to the DJF." (*In re C.H.*, at p. 107.) *In re C.H.* has no bearing here, as the application of section 731, subdivision (a)(4) or section 733, subdivision (c) is not at issue.

appeal that the Secure Track programs are not "real programs" is entirely misplaced.

We now turn to T.J.'s other contention that the juvenile court assumed facts in evidence relevant to the criterion in section 875(a)(3)(D)—"[w]hether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court."

T.J. takes issue with the following comments made by Judge Jackson at the dispositional hearing:  "[F]or whatever reason, Mom and Dad aren't really stepping up, and Camp [Sweeney] requires that.  You know, that's one of the things, Camp [Sweeney] really requires the family step up and come to the forefront and be copartners in all this. . . . [¶] . . . [¶]  And this family, who I care a lot about, they've just never been able to really step up and help their children."

According to T.J., "[t]he juvenile court judge, while expressing an exceptional level of warmth and concern for [his] large family, also thought that he knew the parents and their capacities, from a series of cases."  By "series of cases," T.J. apparently means "earlier cases involving other siblings," as he states in his reply brief.  T.J. also states, "Strangely, the judge had a lengthy conversation with T.J.'s father, before going on the record."  Thus, in T.J.'s view, the court "assumed facts outside the record[ ] concerning: (1) the family participation that an effective program at Camp Sweeney requires, and (2) [his] family's inability to engage in the required participation."  In turn, T.J. argues the court assumed facts not in evidence relevant to section 875(a)(3)(D) of whether the goals of rehabilitation and community safety could be met at a less restrictive, alternative placement.

Preliminarily, T.J. did not object to the juvenile court's purported

19

reliance on facts outside the record on any grounds.  By failing to do so, he has forfeited his claims on appeal.  (See *People v. Zapien* (1993) 4 Cal.4th 929, 966; accord, *id.* at p. 1007, fn. 1 (dis. opn. of Mosk, J.) ["I agree with the majority . . . that . . . by failing to object to the trial judge's reliance on facts outside the record, the defense did not preserve the question for review."]; *Guadalupe A. v. Superior Court* (1991) 234 Cal.App.3d 100, 108.)  Thus, we may disregard the contention.  (See *People v. Zapien, supra,* 4 Cal.4th at p. 966 [declining to consider defendant's claim that trial judge improperly considered outside evidence due to his failure to object].)[5]

But even if T.J. preserved the issue for appeal, it fails on the merits. T.J. fails to establish that the juvenile court assumed facts not in the record.

T.J. suggests that Judge Jackson based his findings on an off-the-record conversation he had with T.J.'s father during the dispositional hearing.  At the beginning of the hearing, and while on the record, T.J.'s father asked Judge Jackson how he was doing, and Judge Jackson replied, "I've been good" and that he had not seen T.J.'s father in a while.  There was then a discussion off the record.  Later during the hearing, Judge Jackson explained to the parties, "as you heard before we got back on the record, I had a long conversation with dad.  I told him I haven't seen him in awhile."  Thus, as Judge Jackson explained, the off-the-record discussion essentially

---

[5] We reach the same conclusion as to T.J.'s contention raised for the first in his reply brief that the consideration of evidence outside the record deprived him of due process.  T.J. never raised this claim in the trial court, and so it is forfeited.  (See *D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 632 ["California courts recognize that claims alleging violations of due process rights can be forfeited by failing to raise them in the trial court"], citing *People v. Partida* (2005) 37 Cal.4th 428, 436; *People v. Cardona* (2009) 177 Cal.App.4th 516, 523.)  The due process challenge is *doubly* forfeited because T.J. failed to raise it in his opening brief.  (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642–643.)

consisted of an exchange of pleasantries between himself and T.J.'s father during the announcement of the party appearances. Further, Judge Jackson did not state or suggest he relied on that discussion in making his findings.

T.J. also fails to establish that the juvenile court assumed facts based on other cases involving T.J.'s siblings, assuming such cases exist. Before commenting on his familiarity with T.J.'s family, Judge Jackson expressed: "this is one thing about being a juvenile judge, you stay with the families; you stay with these families forever. I've been with [T.J.] since 2019. I really care about this family. I know all the boys. I know all the kids. I've known the kids that have been born in front of me, basically. . . . I know what's happening with the family." Judge Jackson did not state what information he was relying upon when he made these comments. But later during the hearing, immediately before announcing the dispositional findings, Judge Jackson indicated he had read and considered the probation officer's reports and all relevant evidence in this case, and took judicial notice of all prior orders and findings in this case. Thus, at best, there is ambiguity as to whether Judge Jackson's finding regarding T.J.'s parents' inability to provide the support required at Camp Sweeney was based on information he gathered from these proceedings or, as T.J. contends, from other proceedings involving his siblings.

This ambiguity, however, must be construed against T.J., not the other way around. (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069, citing *Johndrow v. Thomas* (1947) 31 Cal.2d 202, 208–209 [" 'It is an established rule of law that the findings of fact are to receive such a construction as will uphold rather than defeat the judgment thereon. For this purpose they are to be liberally construed, and any ambiguity or inconsistency therein is to be resolved in favor of sustaining the judgment.' "]; *Winograd v. American*

*Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 ["[a] ruling by a trial court is presumed correct, and ambiguities are resolved in favor of affirmance"]; *California School Employees Association v. King City Union Elementary School Dist.* (1981) 116 Cal.App.3d 695, 702 [appellate court must resolve any uncertainty in trial court findings " ' "so as to support the judgment rather than to defeat it" ' "].) Only "[w]hen the record clearly demonstrates what the trial court did" will the reviewing court "not presume it did something different." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1384.) Here, the record does not *clearly* demonstrate the court relied on information from other cases. Accordingly, we must construe the court's comments in a manner that supports the commitment order—that is, as an order based on facts presented in the record in *this* case. In short, T.J.'s claim that the court relied on facts outside the record fails.

But even assuming the juvenile court improperly considered outside information, any such error was harmless under any standard. (See *People v. Woodward* (1992) 4 Cal.4th 376, 387 [trial error, as opposed to a structural defect, subject to harmless error analysis]; see also *People v. Watson* (1956) 46 Cal.2d 818, 836 [errors of state law are harmless unless it is "reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [federal constitutional error must be shown to be harmless beyond reasonable doubt].) Even if we disregard the information the juvenile court purportedly learned from other cases, the record contains substantial evidence supporting the juvenile court's decision that Camp Sweeney would be unsuitable, which evidence the court did consider.

The record in this case includes the probation officer's dispositional report and supplemental memorandum. As mentioned, the memorandum

states, "Camp Sweeney requires a parent to be involved and active in the program and historically there has not been a parent that has been active and support in rehabilitation." As explained in the dispositional report, T.J.'s family history consisted of domestic violence in the home, two substantiated allegations of general neglect by T.J.'s mother, and a lack of structure in the home. Based on this, the probation officer observed that the family, though "close-knit," needed "[t]o be more available for [T.J.]" in his rehabilitation. T.J. does not argue that the probation officer lacked sufficient knowledge of the programs at Camp Sweeney. Indeed, we may presume the probation officer had such knowledge. (See *Carlos J.*, *supra*, 22 Cal.App.5th at p. 10 [probation department's "report can fairly be read as asserting that the DJF is the best placement to address appellant's needs and it can be presumed that assertion was based on some knowledge of the DJF"].) Nor does he dispute the foundation or accuracy of the probation officer's reports regarding his probation history, specific needs, and family background.

Thus, the record contains ample evidence to support the juvenile court's finding that T.J.'s family would likely be unable to provide the level of support that a placement at Camp Sweeney required. This evidence—when combined with other undisputed evidence in the record such as T.J.'s history of absconding from past placements, failure to reform despite a high level of court and probation intervention, escalating delinquent conduct, and the seriousness of his current offense—constitutes overwhelming evidence supporting the juvenile court's determination that Camp Sweeney would not be suitable. Therefore, assuming that the juvenile court erred in relying on outside information, any such error was harmless under any standard.

Lastly, we address an argument T.J. makes in passing: "There is something fundamentally unfair about the scenario of a youth who finds

himself in the juvenile justice system due to his parents' inability to provide structure in the home, and then is locked up rather than sent to Camp because his parents are sometimes overwhelmed and disorganized. (See generally *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, re [*sic*] fundamental fairness as requirement of due process.)" This argument is unavailing. First, *Judith P.*, a juvenile dependency case, is inapposite. There, the court held it was "fundamentally *unfair* to terminate either a parent's or a child's familial relationship if the parent and/or child has not had an adequate opportunity to prepare and present the best possible case for continuation of reunification services and/or reunification." (*Judith P.*, *supra*, at pp. 557–558.) These concerns regarding notice and opportunity are not implicated in this case.

Second, T.J.'s argument gives the incorrect impression that the juvenile court committed him to Secure Track solely because of his family situation. But that was only one factor that the juvenile court in this case considered. And T.J. does not argue or provide any authority establishing that a juvenile court may not consider a ward's family circumstances in determining whether a proposed placement would be suitable. Further, T.J.'s argument ignores that the juvenile court made its determinations on evidence of T.J.'s *own* conduct. As already explained, that evidence includes T.J.'s lack of success on probation, history of absconding from less restrictive settings, escalating delinquent history, and the severity of his present offense.

For all these reasons, T.J. provides no basis for us to reverse the juvenile court's order committing him to Secure Track.

## DISPOSITION

The dispositional order is affirmed.

24

_____

Richman, J.

We concur:

_____

Stewart, P. J.

_____

Desautels, J.

*In re T.J.* (A168593)